Filed 12/22/15  Wells Fargo Bank v. Thornton CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WELLS FARGO BANK, N.A.<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GERALD THORNTON,<br><br>        Defendant and Appellant. | A143854<br><br>(Solano County<br> Super. Ct. No. FCS042764) |

In April 2007, Thornton & Sons Jewelers, Inc. (Thornton & Sons) executed a promissory note in which it agreed to repay a loan of $800,000 made by Wells Fargo, N.A. (Wells Fargo).  Gerald Thornton, who wholly owns Thornton & Sons, personally secured the note by pledging, via a deed of trust, real property he and his wife owned.[1]  Gerald also signed a personal guaranty.  Following Thornton & Sons's default on the note, Wells Fargo foreclosed on the property and sued Gerald for a deficiency judgment.  Relying on the principle that a lender may obtain deficiency judgments from guarantors (Code Civ. Proc., § 580d, subd. (b)), the trial court granted Wells Fargo's motion for summary judgment.[2]  On appeal from the judgment against him, Gerald primarily

---

[1] Because Gerald and his wife Erika share the same last name, we use their first names when referring to them individually.

[2] All statutory references are to the Code of Civil Procedure unless otherwise stated.  In relevant part, section 580d provides:  "(a) Except as provided in subdivision (b), no deficiency shall be owed or collected, and no deficiency judgment

1

challenges the trial court's conclusion that he raised no triable issue of material fact regarding his "sham guaranty" defense. We reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On or about April 23, 2007, Wells Fargo made a business loan of $800,000 to Thornton & Sons, which Thornton & Sons agreed in a written promissory note (Note) to repay. The loan was made to refinance a previous loan to Thornton & Sons and was secured by a deed of trust against property located in Dixon, California (Property). Title to the Property securing the note was not vested in Thornton & Sons; it was held by Gerald and Erika, as trustees of the Gerald Thornton and Erika Thornton Revocable Living Trust, dated February 16, 1993 (Thornton Trust). Accordingly, the deed of trust was signed by Gerald and Erika, as trustees of the Thornton Trust. At the time it made the loan, Wells Fargo knew that Gerald and Erika were the settlors, trustees and beneficiaries of the Thornton Trust.[3]

Gerald also personally signed a separate commercial guaranty (Guaranty), wherein he "absolutely and unconditionally guarantee[d] full and punctual payment and satisfaction of the indebtedness of [Thornton & Sons] to [Wells Fargo]." In the Guaranty, Gerald "waive[d] all rights and defenses that Guarantor may have because

---

shall be rendered for a deficiency on a note secured by a deed of trust or mortgage on real property or an estate for years therein executed in any case in which the real property or estate for years therein has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust. [¶] (b) The fact that no deficiency shall be owed or collected under the circumstances set forth in subdivision (a) does not affect the liability that *a guarantor, pledgor, or other surety might otherwise have* with respect to the deficiency, or that might otherwise be satisfied in whole or in part from other collateral pledged to secure the obligation that is the subject of the deficiency." (Italics added.)

[3] Because the Property effectively remained owned by Gerald and Erika, we hereafter omit reference to the Thornton Trust. (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1319 [property held in a revocable inter vivos trust deemed property of settlor]; *Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2010) 184 Cal.App.4th 196, 208 [same].) We also reject Wells Fargo's unsupported assertion that we must assume the Property actually is the separate property of Erika.

2

[Thornton & Sons]'s obligation is secured by real property" including but not limited to "any rights and defenses based on Section 580a, 580b, 580d, or 726."

Thornton & Sons defaulted on the loan. On July 6, 2011, the Property was sold to Wells Fargo at a nonjudicial foreclosure sale for a credit bid of $682,540.40. Wells Fargo applied the proceeds of the sale to the principal amount owing on the Note, which left a balance owing of $40,323.29 in principal and $32,237.71 in interest. Wells Fargo then sued Gerald for the difference and moved for summary judgment.

Gerald opposed Wells Fargo's motion and filed his own motion for summary judgment, arguing that Wells Fargo is precluded, as a matter of law, from obtaining a deficiency judgment against Gerald after a nonjudicial foreclosure sale of his own property. In the alternative, Gerald contended that a disputed issue of material fact remained regarding his "sham guaranty" defense.

The trial court granted Wells Fargo's motion for summary judgment and denied Gerald's. The trial court concluded that Gerald, as a matter of law, was not protected by the antideficiency statutes because of his status as a guarantor. It further concluded Gerald had failed to show a triable issue of material fact regarding the sham guaranty defense. The court explained: "The sham guaranty defense is based upon a claim that the defendant was not a true guarantor but merely the principal obligor under a different name. [Citation.] However, [Gerald] fails to produce any evidence that the corporate entity of [Thornton & Sons] was not properly formed or that [Gerald] failed to observe the necessary formalities that would protect [him] from corporate liabilities. [Citation.] [Gerald] fails to produce any evidence that [Wells Fargo] structured the loan agreement in order to subvert the antideficiency law, such as a showing that [Gerald] intended to obtain the loan in his own name but was advised or required by [Wells Fargo] to create a corporate entity to be the borrower and to execute a guaranty on behalf of that entity. [Citations.] To the contrary, [Gerald] concedes that he was acting as 'president and secretary of [Thornton & Sons]' at the time of the making of the loan and that the purpose of the 2007 loan was to refinance an existing loan that was held by [Thornton & Sons.] Consequently, [Gerald] has not produced the necessary evidence to suggest that

3

there exists a triable issue of material fact regarding [his] status as a true guarantor." (Citing *California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 632, 638 (*Lawlor*) and *Union Bank v. Brummell* (1969) 269 Cal.App.2d 836, 838.) Judgment was entered against Gerald in the total amount of $130,238.03, plus attorney fees and costs. Gerald filed a timely notice of appeal from the judgment.

## II. DISCUSSION

Gerald contends the trial court erred in granting summary judgment for Wells Fargo because, after losing his own real property in a trustee's sale, he was protected as a matter of law by the antideficiency statutes. Gerald also argues that a triable issue of material fact exists regarding his "sham guaranty" defense. We address each argument in turn.

### A. *Summary Judgment and Standard of Review*

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 & fn. 11; accord, § 437c, subd. (c).) "A plaintiff . . . has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on that cause of action. . . ." (§ 437c, subd. (p)(1).) "A plaintiff's initial burden, however, does not include disproving any affirmative defenses the defendant asserts. 'Once the plaintiff . . . has met [its] burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' (§ 437c, subd. (p)(1); see *Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 564–565.)" (*Lawlor, supra,* 222 Cal.App.4th at pp. 630–631.)

"On appeal, we determine de novo whether there is a triable issue of material fact and whether the moving party is entitled to summary judgment as a matter of law." (*Republic Indemnity Co. v. Schofield* (1996) 47 Cal.App.4th 220, 225.) " 'We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the

4

uncontradicted inferences the evidence reasonably supports.' " (*Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co., supra,* 170 Cal.App.4th at p. 562.)  "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

B.      *Antideficiency Laws*

Gerald first challenges the trial court's interpretation of the antideficiency statutes (§ 580d).  Gerald suggests that, as the owner of the Property, he is necessarily also the principal obligor and entitled, as a matter of law, to the protection of the antideficiency statutes.  Gerald concedes, "the protections of the anti-deficiency statutes may be waivable under Civil Code Section 2856 by someone who is nothing more than a guarantor."[4]  However, he asserts the same protections "may not be waived by the property owner/trustor himself, who is directly entitled to those unwaivable protections." On the other hand, Wells Fargo concedes that if the borrower owns the real property securing the loan, then the borrower or the principal obligor is protected under section

---

[4] Civil Code section 2856, subdivision (a)(3), provides:  "Any guarantor or other surety, including a guarantor of a note or other obligation secured by real property or an estate for years, may waive . . . : [¶] . . . [¶] (3) Any rights or defenses the guarantor or other surety may have because the principal's note or other obligation is secured by real property or an estate for years.  These rights or defenses include, but are not limited to, any rights or defenses that are based upon, directly or indirectly, the application of Section 580a, 580b, 580d, or 726 . . . to the principal's note or other obligation."  Civil Code section 2856, subdivision (c)(2)(B), provides:  "[T]he following provisions in a contract shall effectively waive all rights and defenses described in paragraphs (2) and (3) of subdivision (a): [¶] The guarantor waives all rights and defenses that the guarantor may have because the debtor's debt is secured by real property.  This means, among other things: [¶] . . . [¶] (2) *If the creditor forecloses on any real property collateral pledged by the debtor:* [¶] . . . [¶] (B) *The creditor may collect from the guarantor even if the creditor, by foreclosing on the real property collateral, has destroyed any right the guarantor may have to collect from the debtor.*  This is an unconditional and irrevocable waiver of any rights and defenses the guarantor may have because the debtor's debt is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 . . . ."  (Italics added.)

580d from a deficiency judgment. However, Wells Fargo maintains that the signature on the promissory note is determinative. Because Gerald did not personally sign the promissory note, Wells Fargo insists Gerald is only a guarantor and, at most, a surety. Accordingly, Gerald is not entitled to protection under section 580d.

Gerald's argument need not detain us long. " 'The courts have repeatedly recognized that the antideficiency laws embodied in sections 580a through 580d and 726 reflect a legislative policy that strictly limits the right to recover deficiency judgments for the amount the debt exceeds the value of the security.' [Citation.] Indeed, these provisions, 'enacted during the Depression, limit or prohibit lenders from obtaining personal judgments against borrowers where the lender's sale of real property security produces proceeds insufficient to cover the amount of the debt.' [Citation.] These antideficiency statutes 'bar[] a deficiency judgment following nonjudicial foreclosure of real property (. . . § 580d) or following foreclosure of a purchase money deed of trust on a residence (. . . § 580b).' [Citation.]

" '[T]he [antideficiency] legislation is designed to accomplish several public policy objectives: [¶] "(1) to prevent a multiplicity of actions, (2) to prevent an overvaluation of the security, (3) to prevent the aggravation of an economic recession which would result if debtors lost their property and were also burdened with personal liability, and (4) to prevent the creditor from making an unreasonably low bid at the foreclosure sale, acquire the asset below its value, and also recover a personal judgment against the debtor." [Citations.]' [Citation.] Because the antideficiency legislation was established for a public purpose '[t]he debtor cannot be compelled to waive the antideficiency protections in advance . . . and [the protections] cannot be contravened by a private agreement.' " (*Lawlor, supra,* 222 Cal.App.4th at pp. 631–632.)

However, " '[t]he protections afforded to debtors under the antideficiency legislation do not directly protect guarantors from liability for deficiency judgments. . . . [I]f a guarantor expressly waives the protections of the antideficiency laws, a lender may recover the deficiency judgment against the guarantor even though the antideficiency laws would bar the lender from collecting that same deficiency from the primary

6

obligor.' " (*Lawlor, supra,* 222 Cal.App.4th at p. 632.)  As it is undisputed that Gerald personally executed the Guaranty and section 580d clearly has no application to an action against a guarantor for recovery of a deficiency judgment (§ 580d, subd. (b); *CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 784), we turn to Gerald's contention that he was only a "sham guarantor" and, in fact, a principal obligor (*Lawlor, supra*, 222 Cal.App.4th at p. 632).

C.      *Sham Guaranty Defense*

Gerald's contention that disputed issues of material fact defeat Wells Fargo's motion for summary judgment is more persuasive.  Gerald argues there is substantial evidence that Wells Fargo considered him *a* principal obligor on the Note, if not *the* principal obligor, and relied upon him as the primary source of repayment.  He cites his status as trustor on the deed of trust as well as evidence that Wells Fargo focused almost exclusively on his *personal* financial statements and liquidity in funding the loan.

"Unquestionably after the creditor has resorted to foreclosure under a power of sale in a deed of trust, it is not entitled to pursue the principal obligors for a deficiency." (*Union Bank v. Dorn* (1967) 254 Cal.App.2d 157, 158–159.)  The same is true when a person serves as both a principal obligor and as a supposed guarantor.  (*Ibid.*) Accordingly, California courts recognize a distinction between true independent guaranty contracts and those which were in reality executed by the primary obligor.  (See *Torrey Pines Bank v. Hoffman* (1991) 231 Cal.App.3d 308, 320 (*Torrey Pines*); *Valinda Builders, Inc. v. Brissner* (1964) 230 Cal.App.2d 106, 108–109 (*Valinda Builders*); *Riddle v. Lushing* (1962) 203 Cal.App.2d 831, 836.)

"To be subject to a deficiency judgment . . . a guarantor must be a true guarantor, not merely the principal obligor under a different name.  Indeed, Civil Code section 2787 defines a guarantor as 'one who promises to answer for the debt, default, or miscarriage *of another,* [or hypothecates property as security therefor.]'  [Citations.]  Where the principal obligor purports to take on additional liability as a guarantor, the guaranty adds nothing to the principal obligation and the antideficiency legislation bars a deficiency

7

judgment based on the guaranty because it is not a promise to answer for the debt of another." (*Lawlor, supra,* 222 Cal.App.4th at p. 632.)

However, "California law does not define 'sham' guaranties. The cases which have found a guaranty to be a sham . . . do not enunciate a test but instead mention certain facts and conclude that the guarantor was actually the true purchaser-debtor." (*Paradise Land & Cattle v. McWilliams Ent.* (9th Cir. 1992) 959 F.2d 1463, 1467.) As outlined above, Wells Fargo urges us to resolve this appeal by simply comparing the signature block on the Note to that appearing on the Guaranty. Such a mechanical approach has been rejected. "Section 2787 [of the Civil Code] provides that '[a] surety or guarantor is one who promises to answer for the debt . . . *of another* . . . .' . . . 'That the names "on the dotted line" are different on the promissory note *and trust deed*, on the one hand, and on the guarantee agreement, on the other hand, is not enough to qualify under [Civil Code] section 2787, since "the supposed guarantors against whom suit has been brought [could be] nothing more than principal obligors under another name." ' [Citations.] Importantly, if the guarantor is actually the principal obligor, he is entitled to the unwaivable protection of the antideficiency statutes, including . . . section 580d, which prohibits a deficiency judgment after nonjudicial foreclosure of real property under a power of sale . . . ." (*River Bank America v. Diller* (1995) 38 Cal.App.4th 1400, 1420 (*River Bank*), italics added; *Union Bank v. Dorn, supra,* 254 Cal.App.2d at pp. 158–159.)

Wells Fargo fares no better in arguing that the sham guaranty defense applies in only two situations: (1) when the guarantor would be liable for the debt under the promissory note even without a guaranty (see, e.g., *Union Bank v. Dorn, supra,* 254 Cal.App.2d at p. 159 [guaranties signed by partners of borrowing partnership were concluded to be sham because "[b]oth as guarantors and as partners respondents were jointly liable for the debt on the default of the principal obligor"]); or (2) when the lender is responsible for structuring the loan to avoid the antideficiency protections by requiring an individual to establish a new "sham" entity to serve as borrower so that the individual may serve as the purported guarantor (see, e.g., *River Bank, supra,* 38 Cal.App.4th at pp. 1420–1424). We do not agree that the defense is so limited.

8

"To determine whether . . . guaranties are sham guaranties we must look to the purpose and effect of the parties' agreement to determine whether the guaranties constitute an attempt to circumvent the antideficiency law and recover deficiency judgments when those judgments otherwise would be prohibited. [Citations.] This requires us to examine whether the legal relationship between the guarantor and the purported primary obligor truly separated the guarantor from the principal underlying obligation, and whether the lender required or structured the transaction in a manner designed to cast a primary obligor in the appearance of a guarantor." (*Lawlor, supra,* 222 Cal.App.4th at p. 638; accord, *Torrey Pines, supra,* 231 Cal.App.3d at p. 320.) "It is a factual question whether a person is a true guarantor or a principal obligor in guarantor's guise." (*River Bank, supra,* 38 Cal.App.4th at p. 1422.)

Despite the intensely factual nature of the sham guaranty inquiry, certain principles become clear in review of the case law. In *Valinda Builders, supra,* 230 Cal.App.2d 106, the individual defendants executed a purchase agreement, in which they both agreed personally to pay the purchase price and guaranteed payment of a loan made to their corporation. The corporation was organized shortly before the loan was made, had a paid-in capital of only $200, and the defendants and their wives were its only stockholders, directors, and officers. (*Id*. at p. 107.) The reviewing court concluded there was no evidence the corporation was anything other than "an instrumentality used by the individuals or that defendants were ever removed from their status and obligations of purchasers." (*Id.* at p. 110.) "[T]he alleged guaranty of defendants was no more than a promise to pay their own debt . . . . [¶] . . . [¶] . . . [O]ne who contracts to buy land does not alter his identity and relation as purchaser by a purported guaranty of performance of his own obligation to pay the purchase price." (*Id.* at pp. 110–111.)

In *Torrey Pines*, *supra*, 231 Cal.App.3d 308, the borrower was a revocable living trust that a husband and wife formed several years before the loan was made. The husband and wife were the trust's settlors, beneficiaries, and trustees, and they personally guaranteed the loan. When the trust defaulted, the lender sued the husband and wife on their guaranty to recover the deficiency remaining after it nonjudicially foreclosed on the

9

real property security. The reviewing court affirmed the trial court's ruling that the personal guaranty on a construction loan was a sham guaranty because the legal relationship between the guarantors and the borrower made the guarantors primary obligors. (*Id.* at pp. 313–316, 321.)

In contrast, *Mariners Sav. & Loan Assn. v. Neil* (1971) 22 Cal.App.3d 232, 234, involved a wife who took out a loan secured by her separately owned real property. Her husband signed a personal guaranty. The reviewing court held the husband became a true guarantor because he would not have been personally liable for the loan made to the wife absent the guaranty. (*Id.* at p. 235.)

Similarly, in *Talbott v. Hustwit* (2008) 164 Cal.App.4th 148, a husband and wife who personally guaranteed a loan to a trust they formed were true guarantors and not entitled to the protection of the antideficiency law. The court explained: "Here, the trust arrangement provided the [husband and wife] a significantly greater degree of separation than that in *Torrey Pines*. Although the [husband and wife] are the settlors of the Trust, they are secondary, not primary, beneficiaries. More importantly, [they] are not trustees of the Trust; instead, [they] used a limited liability company as trustee, thus limiting their personal liability for the Trust's obligations. The [husband and wife] became true guarantors because [their] trust arrangement 'actually removed the[m] from their status and obligations as debtors.' " (*Talbott,* at p. 153.) Accordingly, the trial court did not err in holding the antideficiency protections inapplicable. (*Ibid.*)

The *Lawlor* defendants, individual guarantors, challenged deficiency judgments entered against them after a lender nonjudicially foreclosed on real property a limited liability company and several limited partnerships had pledged as security for loans made to them. The defendants were the only members or partners of the entities. (*Lawlor,* *supra,* 222 Cal.App.4th at pp. 628–629.) They argued that the antideficiency statutes applied because "their close relationship with the borrowers made [them] primary obligors on the loans rather than true guarantors." (*Id.* at p. 628.)

The *Lawlor* court concluded the guarantors had presented insufficient evidence to create a triable issue on their sham guaranty defense. (*Lawlor, supra,* 222 Cal.App.4th at

10

pp. 628, 638.) It observed: "In contrast to the borrowers in *Valinda Builders* . . . , [the individual defendants] are not the primary obligors on the loans because they did not enter into the business loan agreements or execute the promissory notes with [the lender]. Moreover, in contrast to *Torrey Pines*, [the primary obligors'] legal status as a limited liability company and a limited partnership, respectively, provide legal separation between those entities as the primary obligors and [the individual defendants] as the guarantors." (*Id.* at p. 638.) The reviewing court further cautioned: "Individuals may structure their own business dealings to limit their personal liability, but they must accept the risks that accompany the benefits of incorporation. . . . [¶] Here, [the individual defendants] failed to offer any evidence showing that [the lender] requested, required, or otherwise had any involvement in selecting the entities, or the form of the entities, that were the borrowers and primary obligors. . . . Without some evidence to show [the lender] had a role in structuring the transactions to make [the individual defendants] appear as guarantors rather than primary obligors, . . . the record shows [the individual defendants] formed [the debtor entities] to protect themselves from those entities' liabilities. In now arguing we should disregard the legal separation those entities provided, [they] seek to obtain the benefits of a course of action they did not follow." (*Id.* at pp. 639–640.)

Wells Fargo contends that this case is analogous to *Lawlor* and that Gerald is a true guarantor because he personally had no liability on the Note until he signed as a guarantor. Gerald is not a party to the Note. And admittedly, as a corporation, Thornton & Sons's shareholders are generally not personally liable for its debts. (*ECC Construction, Inc. v. Ganson* (2000) 82 Cal.App.4th 572, 575–576.) However, "[e]ven where a corporation is the nominal primary obligor, and the debt is guaranteed by its officers and shareholders, the guarantors may nevertheless be considered the primary obligors. This is true even though the corporation's debt does not directly obligate the shareholders and officers." (*River Bank, supra,* 38 Cal.App.4th at pp. 1423–1424.) Furthermore, Wells Fargo overlooks the key distinction between this case and *Lawlor*. Unlike in *Lawlor*, *supra,* 222 Cal.App.4th at pages 628–629 (or any of the cited

authority), where the guarantors had created valid, separate corporations to both take the loans *and hold the real property securing the loans*, it is undisputed that, here, Gerald personally executed a deed of trust that secured the Note with his own property.

The facts of this case are closer to those presented in *Valinda Builders* and *River Bank* than in *Lawlor*. In *River Bank, supra,* 38 Cal.App.4th 1400, a developer sought a construction loan to build an apartment complex on land his wholly-owned corporation already owned. The developer intended to use the closely held corporation as the borrower, but the bank required the developer to form a new limited partnership to act as the borrower, with the loan secured by deeds of trust on the property. The developer and corporation separately guaranteed the loan. (*Id.* at pp. 1407–1408, 1421.) Division Three of this court concluded triable issues of material fact existed on a sham guaranty defense.[5] (*Id.* at pp. 1409, 1419–1420.) However, the reviewing court relied on the developer's testimony that the bank insisted his corporation could not be the borrower or the borrower's general partner so the bank could enforce the corporation's guaranty. In fact, the lender required that the borrower be a limited partnership, with a general partner other than the developer's corporation. (*Id.* at pp. 1421–1422.) Furthermore, in making the loan, the bank did not examine the financial condition of the entity that served as the borrower's general partner, but rather relied exclusively on the financial condition of the developer and his corporation because it considered them the true borrowers. (*Id.* at pp. 1422–1423.) Because evidence suggested the lender specifically structured the loan to require another layer of separation between the primary obligor on the loan, and the developer and his corporation as guarantors, a triable issue existed on whether the bank acted to "subvert[] the purpose of the antideficiency laws 'by making a related entity the debtor while relegating the principal obligors to the position of guarantors.' " (*Id.* at p. 1423.)

---

[5] The lender did not move for summary adjudication on its cause of action to enforce the corporation's guaranty. (*River Bank, supra,* 38 Cal.App.4th at p. 1419, fn. 13.)

Here, in contrast to *River Bank*, there may be no evidence that Wells Fargo insisted on a newly created entity to serve as borrower. However, contrary to Wells Fargo's assertion and the trial court's apparent understanding, *River Bank* does not indicate this is the dispositive test of the sham guaranty defense. (See *River Bank, supra,* 38 Cal.App.4th at pp. 1420–1424; see also *Lawlor, supra,* 222 Cal.App.4th at p. 638; *Torrey Pines, supra,* 231 Cal.App.3d at p. 320.) In any event, as in *River Bank,* there is also evidence that Wells Fargo looked primarily, although not exclusively, to Gerald and Erika's assets to justify the loan. (See *River Bank,* at p. 1420, fn. 14.)

Contrary to Wells Fargo's assertion, it is not undisputed that Wells Fargo expected Thornton & Sons would provide the primary source of repayment on the loan. Wells Fargo points to declarations and loan documents purportedly showing that it evaluated Thornton & Sons's financial documents, including a business balance sheet and income statement, as well as corporate tax returns, before making the loan and concluded that Thornton & Sons had "substantial cash and marketable securities . . . which could make up the temporary funds flow deficiency . . . ." Although the loan documents show Wells Fargo noted Thornton & Sons's "strong history of profitability," we agree with Gerald that the documents are susceptible of another interpretation. Wells Fargo also required Gerald to provide copies of his personal tax returns and financial statements. "There is nothing unusual about a bank asking for financial information from a person or entity that is guaranteeing a loan." (*Lawlor, supra,* 222 Cal.App.4th at p. 640.) However, here, in its credit approval presentation, Wells Fargo at one point notes, consistent with Gerald's declaration, that Thornton & Sons submitted only its tax returns and did not submit any financial statements to support its loan application. It is reasonable to infer from these same documents and Gerald's declaration that Wells Fargo, in fact, relied on *Gerald's* "substantial cash and marketable securities" to mitigate the identified "funds flow deficiency." Significantly, as we have already noted, Gerald also presents evidence that Wells Fargo insisted on having the loan secured by real property it knew was owned by Gerald personally, not Thornton & Sons.

Finally, and perhaps most tellingly, the express terms of the deed of trust support Gerald's argument that Wells Fargo sought and obtained his personal liability on the underlying obligation. In the deed of trust, Gerald as "Trustor" agreed that "[a]ll obligations of [Thornton & Sons] and [Gerald] under this Deed of Trust shall be *joint and several*." (Italics added.) By its terms, the security agreement would be fully performed "[i]f [Thornton & Sons] *and* [*Gerald*] pay all of the indebtedness when due . . . ." (Italics added.) "Indebtedness" was defined to include, "without limitation, all liability of [Thornton & Sons] *or other party* having its obligations to [Wells Fargo] secured by this Deed of Trust." (Italics added.)

Given these terms, we cannot agree with Wells Fargo that, in signing the deed of trust, Gerald's only role in connection with the loan was as a surety. "The suretyship relation . . . arises where two persons are under obligation to the same obligee, who is entitled to but one performance, as between the two who are bound, and one of them should ultimately bear the burden of the obligation. The obligor ultimately responsible for the debt is the principal and the other is the surety." (*Everts v. Matteson* (1942) 21 Cal.2d 437, 447.) "[T]he terms of the instrument and the circumstances under which it was made determine the character and extent of the undertaking." (*Id.* at p. 449.) Although Gerald's identification as trustor in the deed of trust is not necessarily determinative, it does appear that Gerald became jointly and severally liable for the debt under the express terms of deed of trust. (Cf. *Mead v. Sanwa Bank California* (1998) 61 Cal.App.4th 561, 568–569, 571–572 [owners of real property properly pleaded suretyship despite execution of deed of trust in favor of developer's lender; only developer signed note *and* deed of trust identified secured obligation as belonging only to developer and expressly provided property owners had no liability for the debt].) The terms of the deed of trust refute Wells Fargo's assertion that Gerald was shielded—before signing the guaranty—from any personal liability on the debt by Thornton & Sons's corporate form.

We agree with Gerald that the distinction in the facts presented here only makes his sham guaranty argument more compelling. Wells Fargo certainly does not

14

persuasively explain why Thornton & Sons—which never pledged any property as security for the note—should be the only party entitled to protection from a double recovery by the antideficiency statutes. Here, the guarantor is not truly separated from the principal obligation and one could reasonably infer that the purpose and effect of the agreements was an attempt to recover deficiencies in violation of section 580d. (*Lawlor, supra,* 222 Cal.App.4th at p. 638; *Torrey Pines, supra,* 231 Cal.App.3d at p. 320.)

Our conclusion is consistent with the observation of our colleagues in Division One: "A guaranty is an unenforceable sham where the guarantor is the principal obligor on the debt. This is the case where either (1) *the guarantor personally executes* underlying loan agreements *or a deed of trust* or (2) the guarantor is, in reality, the principal obligor under a different name by operation of trust or corporate law or some other applicable legal principle." (*CADC/RADC Venture 2011-1 LLC v. Bradley, supra,* 235 Cal.App.4th at pp. 786–787.) The trial court erred in granting summary judgment in Wells Fargo's favor.

## III. DISPOSITION

The judgment is reversed. Appellant is entitled to his costs on appeal.


_____
BRUINIERS, J.


WE CONCUR:


_____
JONES, P. J.


_____
SIMONS, J.